06-4930-cv
Beyer v. County of Nassau

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: January 28, 2008                                    Decided: April 23, 2008)

Docket No. 06-4930-cv

_____

NATALIE BEYER,

*Plaintiff-Appellant*,

– v. –

THE COUNTY OF NASSAU, NASSAU COUNTY POLICE DEPARTMENT, HERBERT
FAUST, Chief, in his official and individual capacity, SCOTT WANLASS, Deputy Inspector, in
his official and individual capacity, JAMES GRANELLE, Detective Lieutenant, in his official
and individual capacity and WILLIAM WILLET, Police Commissioner, in his official and
individual capacity,

*Defendants-Appellees.*

_____

Before: WALKER, CALABRESI, and RAGGI, *Circuit Judges.*

_____

Appeal from an Order of the United States District Court for the Eastern District of New
York (Irizarry, *J.*) granting summary judgment to Defendants-Appellees on Plaintiff-Appellant's
federal and state claims of employment discrimination because of the absence of an adverse
employment action.  We hold that the District Court erred in concluding that the repeated denial
of Plaintiff's transfer requests was, as a matter of law, not an adverse employment action.
Accordingly, the grant of summary judgment is VACATED and this case is REMANDED to the
District Court for further proceedings consistent with this opinion.

RICK OSTROVE, Leeds Morelli & Brown, P.C., Carle Place, N.Y., *for Plaintiff-Appellant*.

LORNA B. GOODMAN, County Attorney of Nassau County (Dennis J. Saffran, Appeals Bureau Chief, *of counsel*), Mineola, N.Y., *for Defendants-Appellees*.

CALABRESI, *Circuit Judge*:

Plaintiff-Appellant Natalie Beyer ("Beyer") contends that she was subjected to gender discrimination in her place of employment, in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2000e-17, 42 U.S.C. §§ 1983, 1985, 1986, and the New York State Human Rights Law, N.Y. Exec. Law § 296, when her requests for a transfer to a different unit were repeatedly denied. By Order dated September 25, 2006, the United States District Court for the Eastern District of New York (Irizarry, *J.*) granted summary judgment in favor of Defendants-Appellees County of Nassau, Nassau County Police Department (the "Department"), Herbert Faust, Scott Wanlass, and William Willet (collectively, "Defendants"). Beyer now appeals, arguing that the District Court used an incorrect standard of law to evaluate her claim and that the District Court erred in finding that no adverse employment action had occurred. For the reasons explained below, we vacate the District Court's grant of summary judgment and remand this case to the District Court for further proceedings consistent with this opinion.

**I.    Background**

A.    *The Alleged Adverse Employment Actions*

Construed in the light most favorable to Beyer, the facts in the record are as follows:

Natalie Beyer, a police detective, has a strong scientific background (a B.S. in Chemistry and an M.A. in Forensic Science). Accordingly, in 1988, the year after she joined the Nassau County Police Department, Beyer was assigned to the Serology Section, where she analyzed blood and other bodily fluids recovered from crime scenes.

Over the course of the next fourteen years, Beyer observed a "progressive outsourcing" of the Serology Section's work, as well as a failure to update the Section with current equipment and modern technology. In 1989 or 1990, she noticed that the Department had begun sending out the DNA analysis that the Serology Section had previously performed. By 1993, the Department stopped accepting new DNA casework; and by 2001 or 2002, the Department was sending rape kits and urine stains for outside analysis. Defendants do not dispute this decline in the scientific work of the Serology Section. Rather, they confirm it. An affidavit from then-Deputy Chief of Detectives Paul A. Tully explains that outsourcing was necessary because, by 1993, the Serology Section was out of step with federal testing protocols and found it prohibitively costly to stay current with changes in DNA technology and methods. By November 1999, Beyer heard "rumors and discussions about the possible closure" of the Section. Apparently, these rumors had their origins in an agreement between the Detective Union and the Department, which, in allowing for the elimination of ten detective positions, specifically referenced the Serology Section. Meanwhile, another Section of the Department, the Latent Fingerprint Section ("LFS"), was becoming an increasingly attractive assignment for officers interested in scientific police work.[1] LFS detectives were using rapidly advancing scientific techniques and working with "state of the art computer systems"; "none of the fingerprint work was being outsourced."

---

[1] Police officers in the LFS compare and identify fingerprints found at crime scenes.

In November 1999, Beyer applied for a posted job opening in the LFS, for which she was indisputably qualified. Moving to the LFS would have been a lateral transfer, involving the same pay and title; nevertheless, Beyer points to various reasons why a factfinder could conclude that, by that time, the LFS position was more "prestigious" and highly desirable. It would have gotten an officer out of a Section that was languishing, and it offered opportunities for advanced training in forensic science, as well as access to new technology and techniques. Beyer's direct supervisor interviewed her for the position and highly recommended her. Captain Scott Wanlass, who was in charge of hiring, firing, and granting promotions at the Department, also interviewed her and recommended that she be given the position, so long as a suitable replacement could be found for her in Serology. Nonetheless, the Department denied Beyer's request and gave the position to a male.

In November 2000, Beyer applied for another posted job opening in the LFS. Again, she was indisputably qualified for the job. And as before, she was highly recommended by her direct supervisor and endorsed by Captain Wanlass, who told her that this time he would approve her transfer without requesting a suitable replacement for her in her current Section. Beyer also interviewed with Lieutenant James Granelle, the supervisor of the LFS. Lieutenant Granelle indicated that the opening in the LFS likely included between three and five positions. But, when Beyer subsequently asked Lieutenant Granelle about her chances, he told her that she was "[w]ay on the bottom [of the list]"; "[t]here [we]re 17 people more qualified." Lieutenant Granelle further told her, when she objected to his characterization of her qualifications, that "qualifications aren't everything"; "[w]e have to take care of the boys. . . . [W]e need to take

4

care of the guys that did the right thing for the job for the last ten years."  A month later, Beyer learned that four males and no females had been given the LFS positions.

In or around May 2002, Beyer applied a third time for a posted opening in the LFS, but the Department did not process her paperwork.

B.      *The Complaint and Subsequent Events*

On June 6, 2002, Beyer filed the complaint that is the basis for this action, alleging that Defendants discriminated against her on the basis of her sex.  About six months later, the Department notified Beyer that it intended to close the Serology Section and outsource its work completely.  Beyer asked to be placed in the LFS, but was instead assigned to a squad in the Seventh Precinct, where she performs arrests, takes statements, interviews witnesses and complainants, and processes paperwork.  She claims that she now has no occasion to utilize her scientific knowledge and background.

C.      *The Grant of Summary Judgment*

After discovery concluded, Defendants moved for summary judgment, pursuant to Federal Rule of Civil Procedure 56, on the ground that Beyer failed to show an adverse employment action.  Adopting the Report and Recommendation of Magistrate Judge Arlene R. Lindsay ("MJ Lindsay"), the District Court granted Defendants' request and dismissed this action in its entirety.  *See Beyer v. County of Nassau*, NO. 02 CIV. 3310, 2006 WL 2729196 (E.D.N.Y. Sept. 25, 2006).

**II.     Discussion**

A.      *Standard of Review*

5

We review a district court's grant of summary judgment *de novo.* Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute about a "genuine issue" exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor. *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007). A court reviewing a motion for summary judgment must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir. 2003).

B.    *Beyer's Title VII Claim*

1.    The Governing Law

Title VII of the Civil Rights Act prohibits an employer from discriminating against an individual with respect to her "compensation, terms, conditions, or privileges of employment" because of her sex. 42 U.S.C. § 2000e-2(a)(1) (2000). A plaintiff seeking relief under Title VII has the burden of making out a *prima facie* case of discrimination. *Collins v. N.Y. City Transit Auth.,* 305 F.3d 113, 118 (2d Cir. 2002). This requires her to show that: "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she suffered an adverse employment action; and (4) the circumstances surrounding that action permit an inference of discrimination." *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)). We have characterized this burden as "*de minimis*": it is "neither onerous, nor intended to be rigid, mechanized or ritualistic." *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d

6

456, 467 (2d Cir. 2001) (internal quotation marks and citations omitted).  Nonetheless, a plaintiff's case must fail if she cannot carry this preliminary burden.  *Williams*, 368 F.3d at 126.

Defendants have not disputed, for the purposes of summary judgment, that Beyer has established the first, second, and fourth prongs of her *prima facie* case.  Indeed, they concede that the facts alleged, if credited, would permit a reasonable trier of fact to conclude that gender bias was the reason that Beyer was repeatedly denied transfers to LFS.  Nevertheless, they maintain that no reasonable factfinder could conclude that these denials constituted an adverse employment action.

Employment actions that we have "deemed sufficiently disadvantageous to constitute an adverse employment action include 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Williams*, 368 F.3d at 128 (quoting *Galabya v. N.Y. City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000)).  A denial of a transfer may also constitute an adverse employment action, but we require a plaintiff to proffer objective indicia of material disadvantage; "subjective, personal disappointment[]" is not enough.  *Id.*

2.      The District Court Applied the Correct Standard of Law

Beyer's first argument on appeal is that the District Court applied the wrong standard of law to evaluate her Title VII claim.  She maintains that an adverse employment action occurs whenever an employer denies an employee's request to transfer to a job that is materially and significantly different from the employee's current job.  We have never so held.  As the District Court correctly observed, we require objective indicia that the transfer denial "created a

7

materially significant disadvantage" in the working conditions of the aggrieved employee. *Williams*, 368 F.3d at 128.

3.     The District Court Erred in Concluding that Beyer Failed to Make Out a *Prima Facie* Case

Beyer's second argument – that she adduced sufficient evidence of an adverse employment action to survive summary judgment – is more persuasive. Defendants submit that, because a Serology assignment required greater scientific training than an LFS posting, it cannot be viewed as objectively disadvantageous. While the argument merits consideration by a factfinder at trial, on the record before us, we cannot reach that conclusion as a matter of law. Construing the facts in Beyer's favor and drawing all reasonable inferences against the defendants, the evidence shows (1) that between 1989 or 1990 and 2002, the Department outsourced more and more of the Serology Section's work; (2) that during the same period, the Serology Section was not adapting to the latest technology in the field or receiving new equipment; and (3) that around the time Beyer first applied to transfer to the LFS, there were "rumors" of the Section's eventual closure; these rumors gained credence both from the agreement to eliminate detectives' positions with specific reference to Serology, and from the fact that, at the time of Beyer's second transfer request, Captain Wanlass said that he would endorse Beyer's transfer without asking for a replacement for her in Serology (earlier he had deemed a replacement necessary). These are all objective indications that, by the time Beyer applied to transfer to the LFS, the Serology Section had become a disadvantageous place in which to work. Other evidence, meanwhile, suggests that, for an officer pursuing a career in police forensics, being placed in the LFS was both highly desirable and objectively preferable to

8

working in the Serology Section: (1) at least seventeen people applied for the November 2000 posting, and the supervisor of the unit viewed the jobs as a way of "tak[ing] care of the guys" who had done "the right thing"; (2) assignment to the LFS entailed using up-to-date equipment and learning new skills; and (3) none of the Department's latent fingerprint work was being outsourced.

On the basis of these facts, which we must accept as true, we conclude that a reasonable jury could find that the LFS position Beyer sought was objectively and materially better than the position she occupied and that, accordingly, an adverse employment action had occurred. *See Alvarado v. Texas Rangers*, 492 F.3d 605, 614 (5th Cir. 2007) (holding that denial of a transfer *may* be the objective equivalent of the denial of a promotion, and noting that "if the position sought was objectively better, then the failure to award the position to the plaintiff can constitute an adverse employment action," "even if the new position would not have entailed an increase in pay or other tangible benefits."); *Piercy v. Maketa*, 480 F.3d 1192, 1205 (10th Cir. 2007) (finding summary judgment improperly granted where there was evidence that the desired transfer was not "a truly 'lateral transfer'" as it would be less arduous and stressful than the plaintiff's current job and would increase the plaintiff's opportunity for obtaining additional job and leave flexibility); *Williams v. R.H. Donnelley Inc.*, 199 F. Supp. 2d 172, 178 (S.D.N.Y. 2002), *aff'd,* 368 F.3d 123 (2d Cir. 2004) ("Where the change in position would have resulted in a significant change in duties and could potentially lead to increased opportunities for advancement, courts have held a failure to transfer to constitute an adverse employment action." (internal quotation marks and citation omitted)).

9

Our holding in *Williams* is not to the contrary, and indeed supports our conclusion. *Williams* involved a Sales Training Manager living in Purchase, New York, who alleged that her employer discriminated against her on the basis of sex and race when it refused to transfer her to an Account Executive position in Las Vegas, the place from which she had recently relocated. In concluding that the plaintiff failed to establish an adverse employment action at the *prima facie* stage, we emphasized that the transfer sought would have resulted in a *reduction* in pay and a *demotion*, and that the plaintiff considered the denial of her transfer request "adverse" only because "she wished to return to Las Vegas, where she still maintained a home." *Williams*, 368 F.3d at 128. In other words, unlike Beyer, the plaintiff in *Williams* offered no evidence from which a reasonable juror could conclude that the position to which she sought a transfer would have involved objective and significant improvements in her conditions of employment; rather, the evidence showed no more than "subjective, personal disappointment[]." *Id.*

Our holding today is also consistent with, and finds support in, our cases involving involuntary transfers. In those cases, we have held that an adverse employment action can exist when an employee's new assignment is "materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement." *Galabya*, 202 F.3d at 641. Thus, in *De La Cruz v. New York City Human Resources Administration Department of Social Services*, 82 F.3d 16, 21 (2d Cir. 1996), we concluded that a transfer from a job with prestige and opportunity for professional growth to a job with less prestige and little opportunity for growth could constitute an adverse employment action, even though the employer considered the jobs equal in status. In addition, in *Patrolmen's Benevolent Association of the City of New York v. City of New York*, 310 F.3d 43, 51-52 (2d Cir. 2002), we found that a transfer that

10

resulted in the plaintiff's inability to work in his area of expertise and his subjection to abusive comments from community members could be considered adverse. A similar logic applies to denials of transfer requests. The *denial* of a transfer may constitute an adverse employment action at the *prima facie* step of discrimination analysis when, as here, a plaintiff adduces sufficient evidence to permit a reasonable factfinder to conclude that the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability.

C.      *Beyer's Other Federal and State Discrimination Claims*

The District Court granted Defendants' motion for summary judgment in its entirety, observing that where Title VII is not violated, neither is the New York State Human Rights Law or §§ 1983, 1985, and 1986. Because we conclude that summary judgment was improperly granted on Beyer's Title VII claim, we remand all Beyer's claims for further proceedings.

**III.     Conclusion**

Title VII gives employees the statutory right to compete on an equal basis without regard to gender for anything worth competing over. Its language "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (internal quotation marks and citation omitted). We have no difficulty concluding that a denial of an employee's transfer request has a place on that spectrum. We also recognize, however, that Title VII does not provide redress for every "minor, ministerial stumbling block." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997). We hold today that an employee has established the "adverse employment action" necessary to make out a *prima facie* case when she has proffered evidence from which a

11

reasonable trier of fact could conclude that the transfer sought and denied would have involved an objective and significant improvement in the terms, conditions, or privileges of her employment.  Because a reasonable jury could conclude that Beyer has shown an adverse employment action, we vacate the grant of summary judgment to Defendants and remand this case to the District Court for further proceedings consistent with this opinion.

_____