AMENDED SUMMARY ORDER
J.D. Smith, Jr., Charles W. Piquet, Alfonso Davis, and Cheri Martin-Weatherly appeal the order of the district court (Mor-due, /.), entered on January 22, 2008, 2008 WL 200015, granting summary judgment in favor of defendants-appellees, New Venture Gear, Inc., Daimler Chrysler Corporation (collectively, with New Venture Gear, Inc., “NVG”), Mike Allen, in his capacity as President of the United Automobile, Aerospace and Agricultural Implement Workers of America Local 624 (“UAW Local”), and Stephen Yokich, in his capacity as President of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (“UAW International,” collectively, with UAW Local, the “Union”) on appellants’ claims of violations of Title VII of the Civil Rights Act of 1964 (“Title VII”), 42 U.S.C. §§ 2000e to 2000e-17; id. §§ 1981, 1981A (collectively “ § 1981”); the National Labor Relations Act, 29 U.S.C. §§ 158, 185; and state law claims for violation N.Y. Exec. Law § 290, intentional infliction of emotional distress, breach of contract, and (as to Martin-Weatherly) assault. Doc. No. 08-0849-cv. Louis B. Eudell appeals the order of the district court, pro se, but his sole contention is that he was denied effective assistance of counsel. Doc. No. 08-1096-cv.
Appellants Smith, Piquet, Davis, and Martin-Weatherly alleged intentional discrimination and disparate treatment, hostile work environment and harassment, retaliation, unfair labor practices, breach of *35 contract, violation of New York human rights law, intentional infliction of emotional distress, and assault as to Martin-Weatherly. We have addressed the claims of Smith and Piquet in our decision Smith v. New Venture Gear, Inc., — Fed.Appx. — (2d Cir.2009). Therefore, we confine our analysis to the claims of Davis and Martin-Weatherly and the pro se claim of Eudell. We assume the parties’ familiarity as to the facts, the procedural context, and the specification of appellate issues.
We review the order of the district court granting summary judgment de novo, “construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in [that party’s] favor.” Mathirampuzha v. Potter, 548 F.3d 70, 74 (2d Cir.2008) (internal quotation marks omitted).
I. Complaints Against NVG
A. Racial and Sexual Discrimination and Disparate Treatment
“A plaintiff seeking relief under Title VII has the burden of making out a prima facie case of discrimination.” Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (italics omitted). This requires that the plaintiff show: (1) membership in a protected class; (2) qualification for the job in question; (3) adverse employment action; and (4) circumstances surrounding that action that permit an inference of discrimination. See id. (citing, inter alia, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Once the plaintiff has established a prima facie case, unlawful discrimination is presumed unless the employer can demonstrate that the adverse employment action took place for nondiscriminatory reasons. St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 506-07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden then shifts to the plaintiff to prove that the purported nondiscriminatory reason was pretext. Id. at 507-08, 113 S.Ct. 2742.
First, Davis claims that his March 4, 1999 termination by NVG was due to race discrimination. However, even assuming that Davis has made out a prima facie case, Davis is not able to prove that NVG’s nondiscriminatory reason for his termination was pretext. Davis admits that he was late to the assembly line on March 3, 1999, and as a result his supervisor, Michael Sculley, assigned a part-time worker, Jason Wicks, to take Davis’ place. When Davis arrived, according to witnesses and the report filed by NVG’s Human Resources Coordinator and Labor Relations Representative, Andrew Quinn, Wick continued to work at his assigned station while Davis made physical contact with and oblique threats to Wicks. NVG investigated the incident and determined that Davis had violated NVG’s policy by making contact with Wicks, and therefore Davis was terminated, a punishment later converted into thirty-three days’ suspension.
Next, Davis alleges that he and other African-American NVG employees were subjected to disparate monitoring and discipline based on race. To make out a prima facie claim of disparate treatment, the plaintiff must meet the first three elements of the McDonnell Douglas test and must demonstrate “that a similarly situated employee not in the relevant protected group received better treatment.” McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir.2001). First, Davis’s allegation that Sculley supervised blacks more closely than whites is too speculative and lacking in detail to support a disparate treatment claim. He cites to the deposition of Beverly Carter in which Carter provides an anecdote of one white worker who remained on a break longer than other work *36 ers. Yet Davis does not provide examples of black workers conducting themselves similarly and being disciplined by NVG. Davis’s September 22,1998 letter mentions Sculley’s treatment of a white worker named “Kirk” or “Kurt,” but the district court correctly notes that we lack the information necessary to determine whether this incident is sufficiently similar to others involving black workers, thus preventing it from supporting a disparate treatment claim. Second, Davis’s claim that he was forced to go to a nurse before leaving work sick while such a requirement was not placed on white workers does not support his claim of disparate treatment. Davis has not demonstrated that white workers needed to fulfill fewer or different requirements to leave work when ill, and Davis fails to provide evidence of any NVG policy regarding leaving work while ill. Third, Davis does not provide evidence that black workers received more serious punishment than white workers generally. He cites an example of a white co-worker who threatened to bring a gun into work and was suspended for three months, two months longer than Davis was suspended. He also attempts to draw a comparison between discipline for altercations involving black and white co-workers and that imposed for altercations between white coworkers. However, Davis fails to provide enough evidence that these incidents are sufficiently comparable to permit a reasonable factfinder to determine that NVG disciplined employees disparately on the basis of race. Therefore, the district court was correct in granting summary judgment to the defendants-appellees as to Davis’s discrimination and disparate treatment claims.
Martin-Weatherly claims she was discriminated against because of her gender and race. To support her claim she cites examples of alleged verbal abuse by coworkers but fails to allege any adverse employment action as a result of this abuse. We will address the allegations of verbal abuse when we address Martin-Weatherly’s hostile work environment claim.
Martin-Weatherly also claims that she was subjected to disparate treatment on the basis of race because she was made to leave work when she was pregnant but similarly situated white women were not. However, Martin-Weatherly’s overly-general statements about treatment of other women in the plant and her hearsay testimony concerning Jody Garofalo provide an insufficient basis on which to make a comparison to show disparate treatment. Second, she claims women were treated disparately because they were held to a different bathroom policy than men but states in her deposition that the affected women met with the Union and resolved the problem.[1]
*37 B. Hostile Work Environment
To make out a prima facie claim for hostile work environment, a plaintiff must prove: “(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.” Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir.2003) (internal quotation marks and brackets omitted).
To determine if the conduct is severe enough to constitute a hostile work environment we consider “the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; ... whether it unreasonably interferes with an employee’s work performance ... [; and] the extent to which the conduct occurred because of plaintiffs’ [race].” Demoret v. Zegarelli, 451 F.3d 140, 149-50 (2d Cir.2006) (internal quotation marks and citation omitted).
Davis is unable to impute many of his claims of hostile conduct to NVG. Moreover, the conduct that may be imputed is not sufficiently pervasive or severe enough to make out a hostile work environment claim. With regard to the racial epithets that Davis alleged were used by co-workers, for instance, even when Davis actually claimed to have reported such comments, he provides insufficient evidence to suggest that NVG received notice and failed to respond appropriately. As for the component part allegedly thrown at him, Davis does not state when the part was thrown, nor who threw the part; his testimony that someone intended to hit him with the part is based on speculation and not personal knowledge. Davis cites to co-workers’ testimony concerning a particular incident of racial graffiti and one of a rope tied in a form resembling a noose left in the factory, but NVG was made aware of both incidents and, as a result, it fully investigated them, on one occasion while the incident was also being reviewed by the UAW International. As for the incident of graffiti about which he claims personal knowledge — the racial epithet allegedly written on the bathroom wall— Davis provides no record citation demonstrating that he actually reported this incident. Finally, Davis’s testimony indicates that his supervisors adequately dealt with the smoking incident, and Davis fails to provide evidence of a racial component to this incident sufficient to support a hostile work environment claim. In sum, and substantially for the reasons stated in the district court’s thorough and well-reasoned opinion, we conclude that the district court correctly granted summary judgment to NVG with respect to Davis’s hostile work environment claim.
We reach a similar conclusion in our review of Martin-Weatherly’s hostile work environment claims. With regard to Martin-Weatherly’s race-based hostile work environment claim, we agree with the district court that the isolated incidents Martin-Weatherly alleges, even if coupled with her generalized allegations of racially disparate discipline, are not sufficiently severe or pervasive to permit Martin-Weatherly’s racially hostile environment claim to survive summary judgment. As for her gender-based hostile work environment claim, Martin-Weatherly principally alleges that her co-worker, Daniel Fiore, engaged in threatening and demeaning behavior. NVG’s investigation of Fiore’s conduct determined that it stemmed from *38 his hostility to Martin-Weatherly for being absent from the production line because her absence reduced productivity and the pay of each member of the line, including Fiore. Indeed, even viewed in a light most favorable to Martin-Weatherly, the evidence demonstrates that Fiore engaged in offensive conduct on occasion, but the evidence fails to show that this conduct had any gender-related element. The few alleged incidents of Fiore making remarks derogatory to women are too sporadic to support a hostile work environment claim, and there is no evidence that Fiore’s comment that he would “get” Martin-Weatherly was meant or taken to have any sexual connotation. Regarding Cour-cy’s remarks, they were made during an isolated incident that Union officials addressed and did not alter Martin-Weath-erly’s ability to work such that they could support a hostile work environment claim. Finally, Martin-Weatherly’s racial harassment and sexual harassment claims appear to be distinct and unrelated, and therefore we will not consider the possibility of grafting them together to find the existence of a viable claim. In sum, the district court was correct in granting summary judgment to defendants-appellees as to both Davis and Martin-Weatherly’s hostile work environment claims.
C. Retaliation
“To establish a prima facie case for retaliation, a plaintiff must demonstrated (1) ] participation in protected activity known to the defendant, [ (2) ] an employment action disadvantaging the person engaged in the protected activity, and [ (3) ] a causal connection between the protected activity and the adverse employment action.” Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir.2000) (internal quotation marks omitted).
Davis claims that “several disciplinary actions that culminated in his” 1999 suspension were the result of a letter he sent to NVG and the Union describing the racially discriminatory conduct of Sculley. However, his suspension, which occurred four months after Davis sent his letter to NVG, is explained by nondiscriminatory reasons provided by NVG and unrebutted by Davis. Therefore, there is no evidence of a causal connection between Davis sending the letter and NVG’s suspension of Davis.
Martin-Weatherly claims that after she spoke with John Keller, the head of NVG’s security, and Quinn about the alleged racial incidents — her co-worker’s discovery of the noose and the tattoo displayed to Martin-Weatherly by a white co-worker— she was taken off her “light duty” job, which had enabled her to have less strenuous work while she was pregnant, and placed on a “regular duty” job, which she was unable to do because she was six-and-a-half months pregnant. Assuming that Martin-Weatherly’s allegations concerning her change in position are sufficient to make out a prima facie retaliation claim, she fails to rebut Quinn’s explanation that her change in employment might have been due to the elimination of light duty positions at that time, and in any case could not have been in retaliation against her complaints because Quinn and Keller never discussed those complaints with anyone who had the power to influence Martin-Weatherly’s position. Therefore, the district court was correct in granting summary judgment to defendants-appellees as to Davis’s and Martin-Weatherly’s retaliations claims.
D. State Law Claims
Davis and Martin-Weatherly argue that the applicable statutes of limitation do not bar their state law claims, and in their *39 reply brief they maintain that they have a right to argue these claims on appeal. However, Davis and Martin-Weatherly do not actually argue the merits of these claims anywhere in their briefs, and the only state law claims they mention in their statements of the issues on appeal are their claims against the Union under New York Human Rights Law. See N.Y. Exec. Law §§ 290-301. In fact, they admit in their reply that they did not fully brief their state law claims before the district court. Therefore, with the exception of their claims against the Union under New York Human Rights Law, we conclude that Davis and Martin-Weatherly have waived any argument concerning the merits of their state law claims, and we affirm the district court’s dismissal of those claims. See Norton v. Sam’s Club, 145 F.3d 114, 117 (2d Cir.1998).
As for Davis and Martin-Weatherly’s New York Human Rights Law claims against the Union, they acknowledge that the legal analysis of these claims is identical to that under § 1981. Therefore, our reasons for affirming the district court’s dismissal of their § 1981 claims against the Union, see infra, also support our decision to affirm the dismissal of their claims under New York Human Rights Law.
II. Complaint Against the Union
A union has a duty to fairly represent its members in grievances against an employer. 29 U.S.C. § 158(b). This duty includes an “obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.” Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). “[B]reach [of this duty] occurs only when a union’s conduct toward a member ... is arbitrary, discriminatory, or in bad faith,” United Steelworkers of Am., AFL-CIO-CLC v. Rawson, 495 U.S. 362, 372, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990) (internal quotation marks), or “when [the union] causes an employer to discriminate against employees on arbitrary, hostile, or bad faith grounds,” Ramey v. Dist. 141, Int'l. Ass’n of Machinists & Aerospace Workers, 378 F.3d 269, 277 (2d Cir.2004) (internal quotation marks). “[A] union may not, without a legitimate purpose, take action favoring some of its members at the expense of others.” Id. (internal quotation marks and brackets). “[T]he duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance.” Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1153-54 (2d Cir.1994).
Davis makes the general claim that the Union and its Civil Rights Committee did not properly investigate the claims of its African-American members. First, as to specifics of Davis’s case, the Union filed a grievance with regard to Davis’s suspension, and when NVG converted what had been a discharge into a thirty-three-day suspension, the Union withdrew its grievance after concluding that this was the best outcome available given that Davis was the aggressor in the Davis-Wicks altercation. The Union investigated the incident, as well as Davis’s claims that the altercation had racial undertones and that he was suspended because of his race, and concluded these claims were without merit. Davis chose not to appeal the Union’s decision. Therefore, there is no evidence that the Union breached its duty of fair representation as to Davis. Second, as to Davis’s more general grievance that the Union or its subcommittee breached any general duty to its black members, this *40 claim also fails to survive summary judgment.
Martin-Weatherly claims that the Union and its Civil Rights Committee failed to investigate and act on her claims of Fiore’s harassment, derogatory comments by a supervisor, and restrictions on female workers’ bathroom usage by NVG. First, the record is clear that the Union conducted an investigation of Fiore’s conduct and Courcy’s remark, determined that Fiore did not sexually harass Martin-Weatherly, and reprimanded Courcy for his comment. Second, Martin-Weatherly states in her deposition that after she addressed her concern with NVG’s gendered bathroom policy the Union held a meeting with the affected women members and came to a resolution with NVG. Most importantly, as to both claims, because we find that no trier of fact could conclude that Davis or Martin-Weatherly’s discrimination, retaliation, or harassment claims have merit, we believe it was reasonable for the Union to come to similar findings and determine not to continue to pursue those claims. In sum, the Union did not breach its duty of fair representation to either Davis or Martin-Weatherly, and all federal and state claims against the Union were properly dismissed by the district court.
III. Eudell’s Appeal
Eudell also appeals the order of the district court granting summary judgment in favor of defendants-appellees. However, Eudell has waived any challenge to the substance of the order by stating, in a letter to the district court written by his attorney, that he did not oppose the Union’s motion for summary judgment, and by not raising any challenge in his briefs to this Court. Instead, Eudell claims he was denied effective assistance of counsel under the Sixth Amendment in his civil rights suit against defendants-appellees. “The protections provided by the Sixth Amendment,” which include the right to effective assistance of counsel, “are explicitly confined to criminal prosecutions.” Austin v. United States, 509 U.S. 602, 608, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) (internal quotation marks omitted); accord United States v. 87 Blackheath Rd., 201 F.3d 98, 99 (2d Cir.2000). Therefore, Eudell has no constitutional right to effective assistance of counsel in this case.
Accordingly, for the reasons set forth above, the order of the district court is AFFIRMED.

. We also conclude that the report cited by Davis and Martin-Weatherly for the proposition that blacks were three times more likely to be disciplined than whites does not provide sufficient evidence of disparate treatment. A "plaintiff may use statistical evidence regarding an employer’s general practices at the pretext stage to help rebut the employer's purported nondiscriminatory explanation” and "reveal patterns of discrimination against a group of employees.” Hollander v. Am. Cyanamid Co., 895 F.2d 80, 84 (2d Cir.1990). However, as the report admits, ”[t]he data files provided to date by [NVG] omit most of die information necessary for examination of this question.” Without details of the circumstances behind disciplinary actions, the report was unable to "assess the justification for the discipline” and therefore determine whether the disciplinary action taken was justified. Furthermore, the report noted that there was "an extremely high error rate” which was "particularly harmful in such a small sample.” Therefore, while the report illustrates that black employees tend to be disciplined more often than white employees, the lack of accurate evidence, context surrounding disci- *37 plinaiy action, and the high error rate renders the report insufficient to demonstrate that NVG engaged in disparate treatment based on race.